[Crim. No. 363.   Second Appellate District.—March 25, 1915.]

## THE PEOPLE, Respondent, v. JAMES W. BYRNES, Appellant.

CRIMINAL LAW—GRAND LARCENY—FAKE POOL-ROOM—EVIDENCE—SIMILAR OFFENSES—PREJUDICIAL ERROR.—Where, in a prosecution for grand larceny committed by procuring money to bet on fake races through the medium of a fake pool-room equipped for the purpose of receiving such bets and having therein telegraph and telephone instruments not connected with any system, the evidence is sharply conflicting as to the identity and presence of the defendant as a participant in the crime, it is prejudicial error to admit proof of the commission of like offenses in which the defendant was a participant, where it is not shown that the telephone and telegraph instruments used in the betting exchange where such other offenses were committed were not connected with the wires or system of some telephone company, or that the races were not actually run.

ID.—EVIDENCE—PROOF OF LIKE OFFENSES.—The commission of evidence of other like offenses for the purpose of showing intent is an exception to the general rule and should only be received in cases where the intent accompanying the act is equivocal, or where it otherwise becomes an issue in the trial, as where it is claimed the act was the result of mistake, accident, or inadvertence; but where from the nature of the acts constituting the crime with which the accused is charged, proof of its commission carries with it the evident and conclusive implication of guilty knowledge, there is no occasion for admitting such evidence, and the rule, not the exception, should apply.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Frank G. Finlayson, Judge.

The facts are stated in the opinion of the court.

Earl Rogers, H. L. Giesler, and Frank E. Dominguez, for Appellant.

U. S. Webb, Attorney-General, and Robert M. Clarke, Deputy Attorney-General, for Respondent.

SHAW, J.—Defendant was convicted upon an indictment charging him with committing the crime of grand larceny.

He appeals from the judgment and an order denying his motion for a new trial.

The scheme, trick, and device by means whereof the property of one Friesz was stolen, is fully described in an opinion of this court filed in the case of *People* v. *Rial,* 23 Cal. App. 713, [139 Pac. 661], the theory of the prosecution being that defendant was the one therein referred to as the "man behind the counter," who, as shown, aided and abetted Rial in the commission of the crime for which the latter was convicted. While conceding the property of Friesz was obtained by Rial and his accomplices in the manner there set forth, defendant nevertheless claimed that he was not a party to or participant in the fraud, and that at the time when the transaction occurred in Venice he was in San Bernardino, some seventy-five miles distant therefrom, from which fact, if true, it must follow that he was innocent of the charge. The crime was, as alleged, committed on February 18, 1913, and the case was tried in June, 1914. At the trial Friesz identified defendant as being the man behind the counter who received the bets and, from pretended information received by him over the telephone, shown to have been a false pretense in that it was not connected with or a part of a telephone system, called off the places of the horses falsely represented to be running, and announced the result. The testimony of Friesz was the only evidence offered which tended to identify defendant as being present and participating in the commission of the crime. To controvert this proof, defendant testified that at the time in question he was in San Bernardino, and he procured a witness who, so far as shown, had no interest in the matter, who testified that in said city he met and talked to defendant at about the same hour when the prosecution claimed he was in Venice. A few days after the

alleged offense, defendant was placed under arrest and incarcerated in jail. While there he was conducted to a room wherein there were a number of others, and Friesz being present was asked by officers accompanying him if he recognized any one in the room, other than Rial, who was at the pool-room or acted in connection with Rial, to which, according to the testimony of the officers, he replied in the negative. And on another occasion about the same time, when inquiry into the matter was being considered by the grand jury, and Friesz being in the corridor near the grand jury room, defendant was brought into the corridor and Friesz was informed by officers that the man arrested as being the one who received the bets was present among the persons there gathered, and, as shown by the testimony of such officers, after looking around, replied that he did not recognize him. Friesz claimed that he did at the times in question recognize defendant, but made no answer to the inquiry for the reason that he was ''working under the rulings of the district attorney.'' He also admitted that after the trial of Rial, wherein he appeared as a witness, he stated to the deputy district attorney in charge of the prosecution of that case that he could not identify the ''man behind the counter'' who aided Rial in the perpetration of the crime, giving as a reason for making the statement the alleged fact that he feared if he told the truth ''some of the bunch'' would inflict bodily injury upon him. Upon this evidence so given by Friesz, and notwithstanding the evidence tending to impeach him as a witness, the jury were clearly jutified in refusing to accept the testimony of defendant and his witness as sufficient to establish the *alibi* as claimed. The reason for thus referring at length to this phase of the case is that the sharp conflict therein presented and Friesz' theretofore admitted inability to identify defendant as the man who participated with Rial in committing the offense, became highly important in considering the prejudicial effect of a ruling of the court in admitting evidence of other alleged like offenses, which ruling is the chief ground upon which appellant insists upon a reversal of the judgment.

The evidence admitted under this ruling was the testimony of J. A. Torline and A. N. Koehler as to the commission of alleged like offenses at Redondo Beach in February and November, 1912, whereby it is claimed their property was made

the subject of grand larceny, and according to whose testimony Byrnes, the defendant, was fully identified as the chief operator, or man behind the counter.

As stated by the court in its instructions to the jury, evidence of these alleged collateral offenses was received for the sole and only purpose of showing that defendant was knowingly engaged in promoting and operating a criminal scheme or system of criminal action, and they were told that if they found there was such scheme or system and that the crime with which defendant was charged was committed pursuant to or as a part thereof, then they might consider such evidence of alleged collateral offenses, "for the purpose of determining, and only for the purpose of determining, whether the defendant, if he was a party to the taking of the property of Friesz, acted with a guilty knowledge or with a guilty and felonious intent. But for no other purpose can you consider the evidence respecting any of such other alleged offenses."

It is settled law that, the doing of the act being proved, evidence of other like offenses may, as an exception to the general rule, be received to "repel any inference of accident or mistake" and negative an innocent state of mind existing at the time of the doing thereof. (Underhill on Criminal Evidence, 2d ed., secs. 87, 89; *People* v. *Molineux*, 168 N. Y. 264, [62 L. R. A. 193, 61 Pac. 286] ; *People* v. *King*, 23 Cal. App. 259, [137 Pac. 1076] ; Wigmore on Evidence, secs. 303 and 346.)

As in the case of Friesz, these witnesses were first induced to place bets with the operator of what purported to be a fully equipped betting exchange, having telephonic and telegraphic connection with the track where races were run and, as in the case of Friesz, in making their first bets they used checks drawn upon banks where sufficient funds were not on deposit to meet the same. After it was announced that the horse upon which they had placed their bets was the winner and upon presenting their pool tickets, the question arose as to whether or not the money was on deposit to meet the checks. Whereupon, it was agreed that the cash and checks used in making the bets should be sealed up in an envelope and held until the checks were made good. The witnesses procured sufficient money to cover the checks and, in company with their new-found purported friends who were engaged with

Byrnes in committing the offense, went to the so-called betting exchange for the purpose of collecting the money so won. The operator, stating that everything was correct and that they were entitled to payment, made the excuse that he was waiting for the books which would shortly arrive, when he would make payment. While waiting one of the bunko steerers expressed a desire to bet upon a race about to be run, and upon being informed by Byrnes that they could use the money in his possession to which they were entitled, in making a wager thereon, he instructed the other accomplice to place the entire sum upon a horse which he named to win, but through misunderstanding this other party placed it upon the wrong horse and the entire sum was lost. This evidence as to the paraphernalia and fittings contained in the poolroom, scheme and system operated, is almost identical with that used in the so-called pool-room at Venice, whereby Friesz was fleeced out of his money, with, however, this very material difference: While in the Venice case it was conclusively shown that the telephone and telegraph instruments therein had no connection with the wires or system of any telephone or telegraph company, by reason of which fact the entire scheme whereby Friesz was induced to place his wager was shown to be a fraud and to have no existence in fact, such evidence was wholly lacking in the case of the Redondo Beach betting exchange where Torline and Koehler placed their bets. Indeed, so far as shown, the telephone and telegraph instruments installled at Redondo may have been connected with systems and wires from which the operator received information, and the money may have been hazarded in all respects as Koehler and Torline intended it to be, and the races actually run, since there was nothing shown to the contrary. The room at Redondo appeared from the furnishings and fittings to be a fully equipped betting exchange or pool-room for placing bets on races, having installed therein telephone and telegraph instruments which purported to be connected with a line of wire and system over and by means of which the operator was in constant communication with the tracks where the races were being run, and the representations were made to both Torline and Koehler that they were betting on what were termed and understood by them to be "fixed races." Not a word of evidence was offered tending to show that these representations were untrue, or that the pool-room

and its equipment were other than what they purported to be, or that the bets were not actually made as they intended them to be and the races run with the result as announced by Byrnes. That the evidence tended strongly to show that at the times in question defendant was present, engaged in the operation of an unlawful scheme whereby these witnesses were swindled, may be conceded, but the transaction was wholly lacking in the material element existing in the main case, viz., the fraud and deception practiced upon Friesz. "When the body of the offense has been established, and that defendant passed the check, and it is sought to show guilty knowledge by the fact that defendant also passed other forged paper, the prosecution assumes the same burden as to all the other checks introduced. It must show that such checks were forged." (*People* v. *Whiteman,* 114 Cal. 338, [46 Pac. 99]; *People* v. *King,* 23 Cal. App. 259, [137 Pac. 1076]; *People* v. *Bird,* 124 Cal. 32, [56 Pac. 639].) The testimony of Torline and Koehler, wherein they identified defendant as operating a betting exchange or pool-room at Redondo, was insufficient to establish a like offense in that it was wholly lacking in the essential element of deception and fraud required to constitute the crime with which defendant was charged. Moreover, as stated, the reception of this character of evidence for the purpose of showing intent, is an exception to the rule and should only be received in cases where the intent accompanying the act is equivocal, or where it otherwise becomes an issue in the trial, as where it is claimed the act was the result of mistake, accident, or inadvertence, where from the nature of the acts constituting the crime with which the accused is charged, proof of its commission carries with it the evidence and conclusive implication of guilty knowledge, there is no occasion for admitting such evidence, and the rule, not the exception, should apply. (*People* v. *Glass,* 158 Cal. 654, [112 Pac. 281].) Surely, if a man is captured while making his exit in the night-time through a broken window of a store-room, having in his possession goods of the owner stolen therefrom, and his defense is an *alibi,* no evidence of other like acts committed by him should be required to show the criminal intent with which he committed the act. So in the case at bar, proof of the acts by means whereof Friesz claimed to have lost his property, was of a character which could leave no doubt in

the minds of the jurors as to the criminal intent accompanying the act.

That such evidence so erroneously admitted must necessarily have prejudiced defendant in the minds of the jurors, admits of no doubt. The chief question in issue, and the one upon which the evidence of the prosecution was weak, was the identity and presence of defendant as a participant in the criminal act. As to this, the testimony of Torline and Koehler not alone tended strongly to corroborate that given by Friesz, but taken as a whole was well calculated to, and no doubt did, ''create in the minds of the jury a prejudice against the defendant so pronounced as to preclude an unbiased consideration of the question as to whether or not in its entirety the evidence upon the main case left a reasonable doubt of the defendant's guilt.'' (*People* v. *King,* 23 Cal. App. 259, [137 Pac. 1076].)

A number of other alleged errors are discussed in appellant's brief, a consideration of which, however, is, under the view here expressed, rendered unnecessary.

The judgment and order are reversed.

Conrey, P. J., and James, J., concurred.